IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VINCENT JESTER,

     Plaintiff,

v.

EMERSON CLIMATE
TECHNOLOGIES, INC.; EMERSON
ELECTRIC CO. d/b/a FUSITE; JOHN
DOE A, JOHN DOE B, JOHN DOE C,
and JOHN DOE D,

     Defendant.

Civil Action
File No.: 1:19-cv-05735-WMR

## PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW VINCENT JESTER, and hereby Amends his Complaint for Damages in accordance with F.R.C.P. 15(a)(1)(c)  as follows:

## RENEWAL SUIT

1.

Plaintiff is exercising his right to renew a previously dismissed action withing six months of dismissing a previously dismissed lawsuit in accordance with O.C.G.A. Section 9-2-61 and shows unto this Court:

    a. The plaintiff has previously filed a lawsuit against these same defendants See Case No.1:18-cv-04022-WMR [hereinafter referred to as the "PRIOR LAWSUIT"].  A copy of the PRIOR LAWSUIT

is attached as Exhibit "A";

b. The instant lawsuit is based upon substantially the same cause of action as the PRIOR LAWSUIT;

c. The PRIOR LAWSUIT was not dismissed on its merits;

d. The PRIOR LAWSUIT was properly dismissed by stipulation on May 22, 2019.

e. Plaintiff commenced the instant lawsuit in the State Court of Gwinnett County on November 20th, 2019 or within six months of the PRIOR LAWSUIT being dismissed;

f. The PRIOR LAWSUIT was not a void suit;

g. The PRIOR LAWSUIT was a valid lawsuit that is renewable under O.C.G.A. § 9–2–61;

h. The instant action is not a renewal of a previous action which was dismissed on its merits so that the dismissal would act as a bar to the bringing of the petition.

**<u>PARTIES JURISDICTION AND VENUE</u>**

2.

Defendant Emerson Climate Technologies, Inc. (sometimes referred to herein as "Emerson") is a foreign corporation registered and authorized to do business in the state of Georgia. Emerson is engaged in the business of designing, manufacturing

and selling compressors for both residential and commercial air conditioning and heating systems and units all over the United States and the world, including the unit involved this action as described further herein. Emerson's registered agent for service of process is located in Lawrenceville, Gwinnett County, Georgia, and jurisdiction over Emerson is proper in this Court pursuant to O.C.G.A. §§ 14-2-510(b)(1), 14-2-1505(b), and other applicable law. Emerson maintains its corporate headquarters and principal place of business in Sidney, Ohio but markets and sells its compressors throughout the United States, including sales and solicitation of its products through authorized dealers in the State of Georgia. Because Emerson on its own or through its agent(s) transact business in this state and regularly does business, solicits business and/or derives substantial revenues from products sold and used in this state, jurisdiction is proper over it in this Court pursuant to O.C.G.A. § 9-10-91. Venue is proper as to Defendant Emerson pursuant to O.C.G.A. § 14-2-510(b)(1). Venue is also proper over Defendant Emerson pursuant to § 9-10-31, 9-10-90, 9-10-93 and other applicable law as it is a non-resident corporation that is a joint tortfeasor with a resident defendant that is suable in this county. Emerson may be served with process of the Summons and this Complaint for Damages through its registered agent, CT Corporation System, located at 289 South Culver Street, Lawrenceville, Georgia.

3.

Defendant Emerson Electric Co. d/b/a Fusite (hereinafter sometimes referred to as "Fusite") is a foreign corporation registered and authorized to do business in the state of Georgia. Fusite is engaged in the business of manufacturing, selling and distributing into the stream of commerce component parts, such as compressor electric terminals, on compressors for use in air conditioning systems or units for sale across the United States and the globe, including the electric terminal involved in this action as described further herein. Fusite's registered agent for service of process is located in Lawrenceville, Gwinnett County, Georgia, and jurisdiction over Fusite is proper in this Court pursuant to O.C.G.A. §§ 14-2-510(b)(1), 14-2-1505(b), and other applicable law. Defendant Fusite maintains its corporate headquarters and principal place of business in St. Louis, Missouri but markets and sells its compressor component parts throughout the United States, including sales and solicitation of its products through authorized dealers in the State of Georgia. Because Fusite on its own and/or through its agent(s) transacts business in this state, and regularly does business, solicits business, and/or derives substantial revenues from products sold and used in this state, jurisdiction is proper over it in this Court under O.C.G.A. § 9-10-91. Venue is proper as to Defendant Fusite pursuant to O.C.G.A. § 9-10-31(b) as it is a joint-tortfeasor with a resident defendant. Venue is also proper over Defendant Fusite pursuant to O.C.G.A. §§ 9-10-31, 9-10-90, 9-10-93 and other applicable law as it is a non-resident corporation that is a joint tortfeasor

with a resident defendant that is suable in this County. Fusite may be served with process through its registered agent, CT Corporation, located at 289 South Culver Street, Lawrenceville, Georgia, or as otherwise provided by law.

4.

Defendants John Doe A, John Doe B, and John Doe C are unidentified individuals or companies who either own, serviced, or repaired the heating and air conditioning system at issue in this case.

5.

Pursuant to O.C.G.A. § 15-7-4, this Court has subject-matter jurisdiction here.

## FACTS

6.

Plaintiff Vincent Jester ("Plaintiff"), an adult, is a citizen and resident of the State of Georgia. By bringing this action in this Court, he consents to and avails himself of the jurisdiction and venue of this Court.

7.

This action arises out of injuries and severe burns Plaintiff sustained while investigating complaints regarding lack of cooling at 1955 Metropolitan Parkway SW in Atlanta, Georgia on September 18, 2016.

8.

When Plaintiff attempted to determine whether power was reaching the

disconnect switch for the outdoor HVAC unit, he heard a noise coming from the HVAC unit.

9.

When Vincent Jester approached the HVAC unit to investigate, its compressor terminally vented, spewing scalding oil and severely injuring and burning Plaintiff.

10.

Defendant Emerson designed and manufactured the compressor on the air conditioning unit.

11.

Defendant Fusite designed and manufactured the electric terminal that was a component part of the Emerson compressor.

12.

Defendant John Doe A is the unidentified individual or company that owns the property at 1955 Metropolitan Parkway SW, Atlanta, Georgia.

13.

Defendant John Doe B is the unidentified individual or company that was responsible for maintaining the HVAC system at 1955 Metropolitan Parkway, Atlanta Georgia.

14.

Prior to the date of the incident, Defendants John Doe C, and/or John Doe D either serviced or performed repairs on the HVAC unit and subject compressor.

15.

Plaintiff Vincent Jester, an adult, suffered severe burns, injuries, disfigurement and both economic and non-economic losses as the result of an incident that occurred while he was investigating a complaint of lack of cooling at 1955 Metropolitan Parkway SW, Atlanta, Georgia.

16.

As a direct and proximate result of the defective and unreasonably dangerous air condition unit and compressor, their component parts, the defective and unreasonably dangerous refrigerant and the negligent or otherwise tortious conduct of the Defendants, individually and/or collectively, Plaintiff was injured and severely burned.

## LIABILITY OF DEFENDANT EMERSON CLIMATE TECHNOLOGIES, INC.
## COUNT ONE:

## Strict Product's Liability – Defendant EMERSON

17.

Plaintiff incorporates preceding paragraphs 1 through 15 as if set forth fully herein. Defendant Emerson Climate Technologies, Inc ("Emerson") designed, manufactured and sold a Copeland compressor, with an unidentified model number

and serial number. The product in question was installed on a Rheem air conditioning unit, located at 1955 Metropolitan Parkway SW in Atlanta, Georgia.

18.

At some time prior to the date of the incident, Emerson designed and manufactured said compressor and placed it into the stream of commerce.

19.

In designing, manufacturing and selling the subject compressor Emerson knew persons would install, provide maintenance for and repair the compressor. Emerson knew and expected that persons using, purchasing or coming in contact with the compressor would rely upon it to be safe, not have faulty or dangerous parts and not ignite, catch fire or spew scalding oil. Plaintiff did in fact rely on the air conditioning unit to be safe, not have faulty or dangerous parts and not ignite, catch fire or spew scalding oil.

20.

The actions of Emerson in manufacturing and selling a defective compressor constitute conduct which manifests a willful, reckless or wanton disregard for life.

21.

The compressor at issue in this suit was designed, manufactured, constructed, marketed and/or distributed by and through the agents and/or representatives of Emerson.

22.

Emerson was regularly engaged in the business of supplying or placing products, like the compressor in question, into the stream of commerce for use by the consuming public, including Plaintiff.  Further, such conduct was solely for commercial purposes.

23.

Upon information and belief, the compressor in question was defective and in an unreasonably dangerous condition when it left the hands of Emerson and remained defective and unreasonably dangerous at all times thereafter until it ultimately caused Plaintiff serious and permanent injuries, and Plaintiff's damages. The defect aforementioned was unknown to Plaintiff and was not discoverable through the exercise of reasonable care but was well known to Emerson.

24.

At the time the compressor in question was placed into the stream of commerce, it was, or should have been, reasonably expected and foreseeable that the compressor in question would be used in the manner and application in which it was being used at the time of the incident.

25.

With respect to the design of the compressor in question, at the time it left the control of Emerson, there were safer alternative designs. Specifically, there were

alternative designs that, in reasonable probability, would have prevented or significantly reduced the risk of injury to Plaintiff. Furthermore, such safer alternative designs were economically and technologically feasible at the time the product left the control of the Defendant by the application of existing or reasonably achievable scientific knowledge, and if applied would have reduced the risk of the product without unduly compromising its utility.

26.

At the time the compressor in question left control of Defendant Emerson, it was defective and unreasonably dangerous in that it was not adequately designed or marketed to minimize the risk of injury or death. By way of example and without limitation, the product in question was unreasonably, dangerously defective in the following ways:

a. The compressor in question was unreasonably, dangerously, defectively designed in that it has a dangerous propensity to ignite, catch fire and spew scalding oil during foreseeable operations. This made the compressor unreasonably, dangerously, defectively designed for the product's intended and reasonably foreseeable uses;

b. The compressor in question was unreasonably, dangerously, defective in its manufacture and construction to the extent that it had a dangerous propensity to ignite, catch fire and spew scalding oil during

foreseeable use. This condition made the product unreasonably, dangerously, defective for its intended and reasonably foreseeable uses;

c.   The compressor in question was unreasonably, dangerously, defective in its manufacture and construction to the extent that upon information and belief it allowed an overcurrent to melt terminal pins from their surrounding glass, thereby ejecting pressured scalding materials;

d.   The compressor in question was unreasonably, dangerously, defective in its design in that it did not incorporate a permanent guard over the electric terminal to prevent injury from a terminal vent. This condition made the product unreasonably, dangerously, defective for its intended and reasonably foreseeable uses;

e.   The compressor in question was unreasonably, dangerously, defective in its design in that the plastic grounds provided were not adequately designed to protect bystanders in the event of a terminal vent;

f.   The compressor in question was unreasonably, dangerously, defective in that it did not contain adequate instructions or warnings on the proper and safe use of the compressor and did not instruct or warn as to the manner to avoid risks and danger involved, in particular, the dangerous propensity of the compressor to vent, ignite, catch fire

and/or spew scalding oil. Further, the compressor contained inadequate warnings and instructions. These failures made the compressor unreasonably, dangerously, defective for its intended and reasonably foreseeable uses;

g.    The compressor in question was unreasonably, dangerously, defective in that as sold it failed to warn potential users of the risks, nature and extent of danger associated with its dangerous propensity to vent, ignite, catch fire and/or spew scalding oil; and the compressor was unreasonably, dangerously, defective in that the warnings and instructions provided, if any, were not in any form that could reasonably be expected to catch the attention of the reasonably prudent person in circumstances of the product's intended or reasonably foreseeable uses;

h.    The compressor in question was defectively designed in that it did not incorporate a method to monitor overcurrent or other potential overheating events that could lead to a failure of the terminal to terminal pin connection. The failure to include a monitor for use with the compressor rendered the product unreasonably, dangerously, defective for its intended and reasonably foreseeable uses; and

i.    The compressor in question was defectively designed in that it failed

to incorporate a terminal with an external fuse that would eliminate current to the terminal and prevent a failure of the terminal pin to terminal connection. The failure to include an external fuse rendered the product unreasonably, dangerously, defective for its intended and reasonably foreseeable uses.

27.

The unreasonably dangerous and defective compressor was a proximate and producing cause of Plaintiff's damages. As a result of the defects in the product as alleged in the Complaint, Plaintiff has suffered physical injury and pain and suffering, disability and impairment, disfigurement in the past and future, medical expenses in the past and future, expense of hospitalization, medical treatment, and lost wages.

28.

Wherefore, Plaintiff requests damages against Emerson for a sum that exceeds $25,000.00 dollars, with the amount of damages to be determined by the enlightened conscience of the jury at trial.

## **COUNT TWO:**

### **Negligence – Defendant Emerson**

29.

Plaintiff incorporates all paragraphs 1 through 27 as if set forth fully herein.

30.

Emerson is liable for its negligence in designing, inspecting, assembling and/or selling the compressor, with knowledge of its potential for venting.

31.

Emerson was directly responsible for compliance with applicable safety regulations set forth by state statutory provisions as well as common law duties of care.

32.

Emerson breached the duty of care owed to Plaintiff by:

a.    failing to exercise ordinary care;

b.    failing to warn of a defective product;

c.    failure to design, manufacture, produce, sell a product that would not ignite, catch fire or spew scalding oil under the foreseeable circumstances in question;

d.    failure to correct dangerous and hazardous conditions which were known to Emerson or should have been known had Emerson exercised ordinary care and complied with applicable safety laws, which were unknown to the Plaintiff, and of which Emerson had long standing notice and actual constructive knowledge;

e.    failing to incorporate a permanent and adequate guard of the terminal connector block to protect the public from terminal venting

- 14 -

dangers;

f.     failing to incorporate a monitor to shut off power to the terminal prior to a catastrophic failure of the terminal block;

g.     failing to incorporate a terminal with an external fuse to shut off electricity to the terminal prior to a terminal vent;

h.     failing to warn or redesign its products after it had knowledge of other severe injuries to HVAC repairmen associated with terminal vents on its compressors;

i.     failing to pass along warnings it received from Fusite regarding the danger of terminal venting so that HVAC repairman would have the same warnings Emerson received from Fusite;

j.     Failing to follow industry recommended warnings regarding terminal venting. Such warnings have been provided by industry associations and used by other compressor manufacturers, but Emerson continues to fail in providing any warnings or instructions regarding terminal venting on its products; and

k.     Negligent acts and/or omissions described above and any other acts disclosed during discovery or trial.

33.

The above actions and inactions of Emerson were proximate and producing

causes of Plaintiff's damages. As a result of the negligence of Emerson and defects in the product as alleged in the Complaint, Plaintiff has suffered physical injury and pain and suffering, disability and impairment, disfigurement in the past and future, medical expenses in the past and future, expense of hospitalization, medical and nursing treatment, and lost wages.

34.

Wherefore, Plaintiff requests damages against Emerson for a sum that exceeds $25,000.00 dollars, with the amount of damages to be determined by the enlightened conscience of the jury at trial.

## LIABILITY OF DEFENDANT EMERSON ELECTRIC CO. d/b/a FUSITE

## COUNT THREE:

## Strict Product's Liability – DEFENDANT FUSITE

35.

Plaintiff incorporates herein by reference paragraphs 1 through 33 as if set forth fully herein.

36.

At a date in the past unknown to the Plaintiff but known to Defendant, but within the last 10 (ten) years, Defendant Emerson Electric Co. d/b/a Fusite ("Fusite") designed, manufactured and sold component parts, including the compressor terminal connector in question, to Defendant Emerson which was used on

compressors which were assembled and manufactured in Missouri. The product in question was a component part on the Copeland compressor on the subject Rheem HVAC unit.

37.

At some time prior to September 18, 20168, Fusite designed and manufactured the electric terminal connector at issue and placed it into the stream of commerce.

38.

In designing, manufacturing and selling the product Fusite knew the product would be installed on compressors on air conditioning units. Fusite knew and expected that persons using, purchasing or coming in contact with the product would rely upon it to be safe and protect compressors from excessive temperatures and other dangerous conditions. Plaintiff did in fact r30ely on the product to be safe.

39.

The actions of Fusite in manufacturing and selling a defective electric terminal connector that did not protect compressors from excessive temperatures constitutes conduct which manifests a willful, reckless or wanton disregard for life.

40.

The actions of  Fusite in failing to warn Plaintiff  or other persons using or coming in contact with the electric terminal connector of its defective condition

and/or dangerous propensity for causing injury constitutes conduct which manifests a willful, reckless or wanton disregard for life.

41.

The electric terminal connector at issue was designed, manufactured, constructed, marketed and/or distributed by and through the agents and/or representatives of Fusite.

42.

Fusite was regularly engaged in the business of supplying or placing products, like the defective electric terminal connector, into the stream of commerce for use by the consuming public. Further, such conduct was solely for commercial purposes.

43.

The electric terminal connector originally manufactured, distributed and sold by Fusite was defective and in an unreasonably dangerous condition when it left the hands of Fusite and remained defective and unreasonably dangerous  at all times thereafter  until it ultimately caused Plaintiff's injuries, and Plaintiff's damages. The defect aforementioned was unknown to Plaintiff and was not discoverable through the exercise of reasonable care but was well known to the Defendant and should have been disclosed through warnings to any user of the product.

44.

At the time the electric terminal connector was placed into the stream of

commerce, it was, or should have been, reasonably expected and foreseeable that the product would be used in the manner and application in which it was being used at the time of the incident.

45.

With respect to the design of the defective electric terminal connector at the time it left the control of Fusite, there were safer alternative designs. Specifically, there were alternative designs that, in reasonable probability, would have prevented or significantly reduced the risk of injury to Plaintiff. Furthermore, such safer alternative designs were economically and technologically feasible at the time the product left the control of Fusite by the application of existing or reasonably achievable scientific knowledge, and if applied would have reduced the risk of the product without unduly compromising its utility.

46.

At the time the electric terminal connector left control of Fusite, it was defective and unreasonably dangerous in that it was not adequately designed to minimize the risk of injury. By way of example and without limitation, the product in question was unreasonably, dangerously defective in the following ways:

    a.    the terminal connector failed to protect the compressor from terminal venting. This made the product unit unreasonably, dangerously, and defectively designed for its intended and reasonably foreseeable

- 19 -

uses;

b.  The terminal connector was unreasonably, dangerously, defective in its design to the extent it failed to incorporate an external fuse to shut off electrical current before there is a failure between the terminal pin and terminal, which leads to terminal venting. This condition made the product unreasonably, dangerously, defective for its intended and reasonably foreseeable uses; and

c.  The terminal was defective because it does not fail safe when in overcurrent, rather, the terminal pins melt and/or separate from terminal allowing terminal venting.

47.

The unreasonably dangerous and defective Fusite product was a proximate and producing cause of Plaintiffs' damages. As a result of the defects in the product as alleged in the Complaint, Plaintiff has suffered physical injury and pain and suffering, disability and impairment, disfigurement in the past and future, medical expenses in the past and future, expense of hospitalization, medical and nursing treatment, and lost wages.

48.

Wherefore, Plaintiff request damages against Fusite for a sum that exceeds $25,000.00 dollars, with the amount of damages to be determined by the enlightened

conscience of the jury at trial.

## COUNT FOUR:
## Negligence – Defendant FUSITE

### 49.

Plaintiff incorporates herein by reference preceding paragraphs 1 through 47 as if set forth fully herein.

### 50.

Fusite is liable for its negligence in designing the electric terminal connector.

### 51.

Fusite was directly responsible for compliance with applicable safety regulations set forth by state statutory provisions, as well as common law duties of care.

### 52.

Defendant Fusite breached the duty of care owed to Plaintiff by:

    a.    failing to exercise ordinary care to prevent terminal venting;

    b.    failing to incorporate an external fuse or other device on its terminal to shut off electricity prior to a terminal vent;

    c.    failure to design, manufacture, produce, and sell a product that would protect the compressor from excessive temperatures and other dangerous conditions under the foreseeable circumstances in

question;

d.     failure to correct dangerous and hazardous conditions which were known to the defendant or should have been known had the defendant exercised ordinary care and complied with applicable safety laws, which were unknown to the Plaintiff, and of which the defendant had long standing notice and actual constructive knowledge; and

e.     negligent acts and/or omissions described above and any other acts disclosed during discovery or trial.

53.

The above actions and inaction of Fusite were proximate and producing causes of Plaintiff's damages.  As a result of the defects in the product as alleged in the Complaint and the negligence of Fusite, Plaintiff has suffered physical injury and pain and suffering, disability and impairment, disfigurement in the past and future, lost capacity to enjoy life in the past and future, medical expenses, expense of hospitalization, medical and nursing treatment, and lost wages.

54.

Wherefore, Plaintiff requests damages against Fusite for a sum that exceeds $25,000.00 dollars, with the amount of damages to be determined by the enlightened conscience of the jury at trial.

## LIABILITY OF DEFENDANT JOHN DOE A
## COUNT FIVE:

## Negligence – Defendant JOHN DOE A

55.

Plaintiff incorporates herein by reference paragraphs 1 through 53 as if set forth fully herein.

56.

Upon information and belief, John Doe A is liable for negligence in failing to maintain the HVAC unit in a safe condition and failing to warn about the condition of the HVAC unit, among other acts and omissions outlined further below.

57.

John Doe A breached the duty of care it owed to Plaintiff by:

a.  failing to exercise ordinary care;

b.  failing to maintain the HVAC system located at 1955 Metropolitan Parkway SW in Atlanta, Georgia and its component parts including, but not limited to, the subject compressor, in a reasonably safe condition;

c.  failing to warn of the condition of the HVAC unit and its component parts including, but not limited to, the subject compressor;

d.  negligent maintenance of the air conditioning unit and subject compressor; and

e.  acts and/or omissions described above and any other acts disclosed during discovery or trial.

58.

The above actions and inactions of John Doe A were proximate and producing causes of Plaintiff's damages. As a result of the negligence of John Doe A, Plaintiff has suffered physical injury and pain and suffering, disability and impairment, disfigurement in the past and future, medical expenses in the past and future, expense of hospitalization, medical and nursing treatment, and lost wages

59.

Wherefore, Plaintiff requests damages against John Doe A for a sum that exceeds $25,000.00 dollars, with the amount of damages to be determined by the enlightened conscience of the jury at trial.

**LIABILITY AGAINST DEFENDANTS**
**JOHN DOE B and JOHN DOE C**

**COUNT SIX:**
**Negligence – Defendants John Doe B**
**and John Doe C**

60.

Plaintiff incorporates herein by reference paragraphs 1 through 58 as if set forth fully herein.

61.

Defendants John Doe B and John Doe C are liable for negligence in maintaining and repairing the HVAC unit located at 1955 Metropolitan Parkway SW in Atlanta, Georgia and failing to warn about the condition of the HVAC unit,

among other acts and omissions outlined further below.

62.

Defendants John Doe B and John Doe C breached the duty of care they owed to Plaintiff by:

    a.  failing to exercise ordinary care;

    b.  failing to warn of the contents of the subject compressor;

    c.  failing to correct dangerous and hazardous conditions which were known or should have been known had John Doe B and John Doe C exercised ordinary care and complied with applicable safety laws, which were unknown to the Plaintiff, and which John Doe B and John Doe C knew or should have had knowledge of;

    d.  negligent maintenance of the air conditioning unit and subject compressor; and

    e.  acts and/or omissions described above and any other acts disclosed during discovery or trial.

63.

The above actions and inactions of John Doe B and John Doe C were proximate and producing causes of Plaintiff's damages. As a result of the negligence of John Doe B and John Doe C, Plaintiff has suffered physical injury and pain and suffering, disfigurement, medical expenses, expense of

hospitalization, medical and nursing treatment, and lost wages.

### 64.

Wherefore, Plaintiff requests damages against John Doe B and John Doe C for a sum that exceeds $25,000.00 dollars, with the amount of damages to be determined by the enlightened conscience of the jury at trial.

## **PUNITIVE DAMAGES**

### 65.

Plaintiff incorporates herein by reference paragraphs 1 through 63 as if set forth fully herein.

### 66.

Defendants' actions evidence that entire want of due care that rises to the level of conscience indifference to consequences justifying an award of exemplary or punitive damages. The conduct of each Defendant, as set forth herein above, showed willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of a conscious indifference to consequences. The actions of each Defendant entitle the Plaintiff to punitive/exemplary damages.

### 67.

The Plaintiff is entitled to recover punitive damages for the Defendants' conscience indifference to consequences and willful and wanton behavior. Punitive damages should be imposed against each Defendant pursuant to applicable laws, to

punish and deter each Defendant from repeating or continuing such unlawful conduct.

WHEREFORE, Plaintiff prays:

a.  That process issue according to law;

b.  That each defendant be served with a copy of Plaintiff's Complaint and show cause why the prayers for relief requested by Plaintiff herein should not be granted;

c.  That Plaintiff be granted trial by jury;

d.  That the Court enter judgment against each Defendant, jointly and severally, for general and compensatory damages allowable to Plaintiff;

e.  That the Court enter judgment against each Defendant, jointly and severally, for special damages allowable to Plaintiff;

f.  That the Court enter judgment against each Defendant for an award to Plaintiff of punitive damages;

g.  That the Court enter judgment against each Defendant for Plaintiff's attorney's fees and costs of litigation;

h.  That the Court enter judgment against each Defendant, jointly and severally, for all relief sought by Plaintiff under this Complaint;

i.  That the costs of this action be cast upon Defendants; and

j.  That the Court grant Plaintiff such further relief which the Court deems just and appropriate.

This 5th day of January, 2020.

Respectfully submitted,

LINK & SMITH P.C.

**_/s Mark D. Link_**
Mark Link
Georgia Bar No. 453153

2142 Vista Dale Court
Tucker, Ga. 30084
770-414-5473
link@linksmithpc.com

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been furnished via email and U.S.

Mail to counsel record, to wit:


Darren Summerville
Anna Green Cross
THE SUMMERVILLE FIRM, LLC
1226 Ponce de Leon
Atlanta, GA 30361

This 5th day of January, 2020.

LINK & SMITH P.C.


**_/s Mark D. Link_**
Mark Link
Georgia Bar No. 453153

2142 Vista Dale Court
Tucker, Ga. 30084
770-414-5473
link@linksmithpc.com

## FONT CERTIFICATION

Pursuant to LR 5:1(c), I hereby certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

LINK & SMITH P.C.

***/s Mark D. Link***
Mark Link
Georgia Bar No. 453153

2142 Vista Dale Court
Tucker, Ga. 30084
770-414-5473
link@linksmithpc.com