## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| VINCENT JESTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  1:19-cv-05735-WMR |
| | ) | |
| EMERSON CLIMATE | ) | |
| TECHNOLOGIES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION TO EXCLUDE TESTIMONY OF B. DON RUSSELL, JR.

---

Defendants Emerson Climate Technologies, Inc. ("Emerson Climate") and Emerson Electric Co. ("Fusite")[1] (collectively "Emerson") submit this brief in support of their motion to exclude the report and testimony of Plaintiff's purported engineering and liability expert, B. Don Russell, Jr. ("Russell") under Fed. R. Evid. 401, 403 and 702.

---

[1] Emerson Electric Co. is designated in Plaintiff's First Amended Complaint for Damages (Doc. 5) as "Emerson Electric Co. d/b/a Fusite," but Fusite is a division of Emerson Electric Co.

Russell's expert report contains twelve opinions none of which are admissible. Russell's primary opinion (set forth in Nos. 1, 8-10, 12) is that the design of the subject compressor was defective. But Russell bases his theory of defect upon nothing other than the fact that an incident occurred. Russell offers no viable alternative design, he has conducted no testing for any alternative design, he has never designed a compressor, and he offers no testimony that Emerson's design is below any industry standard. Simply put, his methodology is to have the Court "take his word for it." Such *ipse dixit* cannot pass muster under Rule 702.

Moreover, Russell also offers opinions in the form of inadmissible legal conclusions such as that Emerson acted "negligently", the product is "defective", or that Plaintiff "is not at fault." He also purports to offer subjective opinions regarding what Emerson or Plaintiff "knew." It is well-settled that an expert cannot offer legal conclusions or subjective opinions regarding a person's state of mind. Accordingly, opinions 2, 3, 4, 5, 6, 7, and 11 are also inadmissible.

Finally, in opinion 7, Russell states that Emerson Climate "failed to warn" of the known dangers with its compressors. Yet, during his deposition, he unequivocally testified that he was not offering any opinions regarding warnings in this case rendering this opinion in admissible.

Russell may be a competent electrical engineer and a respected professor, but the opinions he purports to offer in this case are the product of either an unreliable methodology or no methodology at all. They are not helpful to the jury. Pursuant to Rule 702, Russell should be excluded from testifying.

# I.

## BACKGROUND

This product liability action arises from an accident that occurred on September 18, 2016, while Plaintiff Vincent Jester was inspecting an air conditioning ("HVAC") unit at Kemper's Caribbean Café in Atlanta. One of the restaurant's operators, Merlene Donegan, called Jester to determine if there was an electrical issue with an HVAC unit at the restaurant because she thought the unit might not be receiving power. *See* Merlene Donegan Deposition at 10:2-15. Jester, an unlicensed, self-taught electrician with no training or experience in HVAC servicing work, was hired only to determine if electricity was reaching the HVAC unit at the restaurant. *See* Vincent Jester Deposition at 11:8-10; 18:7-8; 27:25-28:2; 33:3-5; 44:3-11, attached hereto as **Exhibit 1**.

After Jester arrived, he first checked the circuit breaker for the HVAC unit inside the restaurant, found that it was in the "Off" position and turned it to the "On"

position. Jester Depo., **Ex. 1**, at 48:17-22. He then went outside to determine if the unit was receiving power. *Id*. at 46:6.

There were three separate condensers in an enclosed area at the restaurant. Jester inspected the circled condenser on the far-right side:



Jester turned the disconnect switch, which is located on the wall above the condenser, to the "On" position and determined that the unit was receiving power. *Id*. at 62:6-12. When Jester turned the disconnect switch on, the condenser fan began to turn very slowly. *Id*. at 62:15-21. Jester turned the disconnect switch off and called a friend who was more familiar with HVAC equipment. Jester Depo., **Ex. 1**, at 63:6-11; 67:24-68:3. Although he had already determined that the unit was receiving

power, Jester engaged the disconnect switch a second time and waited to see what would happen. *Id*. at 73:12-18.

Jester heard a "thumping" noise coming from the HVAC unit. *Id*. at 73:13-22. Six or seven seconds later, the compressor located inside the condenser vented, and the compressor's contents ignited when expelled.[2] *Id*. at 75:18-77:24. Jester, who suffered burns to his hands and left forearm from the fire, went back inside the restaurant and turned the breaker off. *Id*. at 78:13-18.

The HVAC system was an amalgamation of "grossly mismatched parts from different manufacturers and "it was not being used as intended." *See* Frank Hagan Deposition at 49:20-21; 166:5-6, attached hereto as **Exhibit 2**; *see also* Alan Kessler Deposition at 15:10, attached hereto as **Exhibit 3**. Trane manufactured the indoor air handler, a 7.5-ton R-22 unit intended for use with a heat pump, in August 1997. Kessler Report (Doc. 46-1) at 23, attached hereto as **Exhibit 5**. Rheem manufactured

---

[2] The compressor compresses and pumps refrigerant in the HVAC system. The compressor's exterior is a hard metallic shell, hermetically sealed to hold the compressor's contents under pressure without rupturing. The "terminal" allows electricity needed to power the compressor's motor to pass through the compressor's metal shell. *See* Affidavit of Scott Schuckmann at ¶ 4, attached hereto as **Exhibit 4**. While the compressor is designed to withstand high pressures and electric currents, if the terminal suffers mechanical damage, the compressor's pressurized contents may "vent" – i.e., escape – through the damaged terminal.  If an ignition source is present, fire may result.

the condensing unit, a 2.0-ton R-410 outdoor cooling-only unit, in July 2010. *Id. See also* Scott Davis Report (Doc. 46-2) at 8, attached hereto as **Exhibit 6**.

Located inside the condensing unit was a Copeland Model ZR44KA-PFV-130 compressor. Tom Bajzek Deposition at 39:25-40:5, attached hereto as **Exhibit 7**. Emerson Climate designed and sold the 3.5-ton R-22 compressor to Carrier in 2006 for installation in a Carrier condenser.[3] *See* Kessler Report, **Ex. 5**, (Doc. 46-1) at 23; Kessler Depo., **Ex. 3**, at 15:17-20.

Fusite designed and manufactured the compressor's electrical terminal, which was welded to the compressor shell. *See* Schuckmann Aff., **Ex. 4**, at ¶ 3. The terminal consists of three cooper core conductive pins surrounded and held in place with smelted glass encased by a cold-rolled steel housing designed to maintain a hermetic seal. *See id.* at ¶ 4. The 700 Series terminal incorporates a necked-down groove on each pin, located outside of the compressor shell and covered by a molded silicone pad. *See id.* at ¶ 5.

According to Plaintiff's origin and cause expert, "the compressor was being abused" because of improper wiring and use of the wrong refrigerant. Hagan Depo., **Ex. 2**, at 53:12-20. The HVAC unit was wired improperly such that it ran

---

[3] The compressor was later reinstalled in the Rheem condensing unit at an unknown time.

continuously. *Id*. at 96:12-18; 97:5-9; 98:8-16. A compressor that runs continuously has a greater propensity to overheat. *Id*. at 100:10-14.

Plaintiff retained B. Don Russell, an electrical engineering professor at Texas A&M University, as an expert witness. Russell was first contacted about this case on January 31, 2019, almost two and a half years after the accident. *See* Deposition of B. Don Russell at 65:1-4, attached hereto as **Exhibit 8**. Five days later, on February 4, 2019, without ever seeing (much less inspecting) the compressor or conducting any testing and having received only a single wiring diagram from another expert, Russell concluded that "the design that allowed for terminal venting of the compressor was inherently flawed." *Id*. at 69:8-22; 82:2-13.[4]

Russell submitted a 7-page report dated March 7, 2019, setting out twelve (12) opinions. *See generally* Report of B. Don Russell ("Report"), attached hereto as **Exhibit 9**. The bulk of Russell's opinions address the compressor's design and what Russell claims are alternative designs.[5] Russell also offers opinions regarding

---

[4] Russell received Jester's deposition and the surveillance video of the accident *after* he reached his design defect opinion expressed on February 4, 2019. *Id*. at 83-84. While Russell prepared a written report, he testified that he informed Jester's counsel that he would express the opinion that the compressor design was defective more than a month earlier.

[5] Opinions 4, 6, 8, 9, 10, 11 and 12.

whether Jester's actions caused the accident[6] and Emerson's knowledge of the

dangers of terminal venting.[7]

## II.

## ARGUMENT

A.  **Expert Testimony Is Not Admissible If The Expert Is Not Qualified, The Opinions Are Unreliable Or The Opinions Are Not Helpful To The Jury.**

The admissibility of expert testimony is governed by Rule 702 of the Federal

Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[6] Opinions 1, 2, and 3.

[7] Opinions 5 and 7.

When applying Rule 702, the Court serves a critical gate-keeping function for the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Because expert testimony can be particularly persuasive, the Court's role is to keep speculative, unreliable testimony from reaching the jury. *Id.* at 595; *see also Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328-29 (11th Cir. 2014) (trial courts "are charged with this gatekeeping function to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony'") (internal quotations omitted).

To determine the admissibility of expert testimony, the Court conducts a three-part inquiry that considers whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

Qualifications alone are not enough to satisfy Rule 702. *Id.* at 1261 ("If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong"). Instead, even a qualified expert may offer only testimony that passes the reliability requirement of Rule 702. *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (recognizing that qualifications "are by no means a guarantor of reliability").

When considering the reliability of an expert's methodology, the Court looks to several factors, including: "(1) whether the methodology can be and has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or potential rate of error of the methodology employed, and (4) whether the methodology is generally accepted." *Hughes*, 766 F.3d at 1329. The Court may also assess whether the opinion naturally flowed from an expert's research or was developed specifically for litigation. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1321 (11th Cir. 1999).

Finally, expert testimony that is not helpful to the jury is not admissible. Expert testimony must "concern matters that are beyond the understanding of the average lay person"; for example, testimony "generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing

arguments." *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) (quoting *Frazier*, 387 F.3d at 1262–63). Expert testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys.*, 50 F.3d 908, 917 (11th Cir. 1995) (citations omitted).

### B.   Russell's Opinions (Nos. 8, 9, 10 and 12) About The Compressor's Design Are Based Solely On His *Ipse Dixit* And Not A Reliable Methodology.

In opinion numbers 1, 8-10 and 12, Russell seeks to opine that the compressor was improperly designed. Russell's opinions regarding the compressor's design are based upon nothing other than the fact that the accident occurred. *See* Russell Depo., **Ex. 8**, at 82; 207:17-21. In fact, Russell offers no opinion at all as to the cause of the terminal venting that occurred:

> My opinions have absolutely nothing to do with the actual root cause, which I don't believe anybody knows, of the incipient failure mechanism or the ultimate failure mechanism of the terminal assembly. *It is the fact that it did occur.* Okay? My opinions are about the occurrence not the causation internally.

Russell Depo., **Ex. 8**, at 215:16-216:2 (emphasis added). In other words, Russell says that the compressor's design falls short because it failed and Jester was injured, regardless of the cause.

Russell is attempting to advance an opinion that is directly contrary to the Georgia's products liability law that applies to Jester's claims. The fact that an accident occurred, standing alone, is not a valid basis on which a jury could find that a product is defective. A product is not defective simply because a person may be injured while using that product. *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 675 (Ga. 1994) ("We reaffirm that under Georgia law a manufacturer is not an insurer that its product is, from a design viewpoint, incapable of producing injury."). *See also Woods v. A.R.E. Accessories, LLC*, 815 S.E.2d 205, 210 (Ga. Ct. App. 2018) ("Because 'virtually any article, of whatever type or design, is capable of producing injury when put to particular uses or misuses, a manufacturer has no duty so to design his product as to render it wholly incapable of producing injury.'") (quoting *Greenway v. Peabody Int'l. Corp.*, 163 Ga. App. 698, 700, 294 S.E.2d 541 (1982) (citation and punctuation omitted)). Accordingly, Russell should not be permitted to testify that the compressor or its terminal is flawed only because a failure occurred.

The remainder of Russell's opinions about the compressor are grounded exclusively in his say-so. They are not based on the application of any reliable scientific methodology. He has not conducted any physical inspection, analysis or testing of any kind on any part of the HVAC unit on which Jester was working.

12

Russell Depo., **Ex. 8**, at 19-20; 64; 86-87. In fact, Russell is emphatic that he has conducted absolutely no testing:

> The answer to all questions about me running tests or experiments on this is going to be I have not, and I've said that several different times, and it's not going to change.

*Id*. at 94:15-19.

Russell does not rely upon any published code or standards in reaching his opinions. *Id*. at 102:15-20. He has no knowledge regarding the service history of the compressor or how it performed in the months preceding the accident. *Id*. at 133:11-12; 147:22-148:8. He has never inspected the scene of the accident. *Id*. at 64. He has never spoken to Jester or any witnesses regarding the accident. Russell Depo., **Ex. 8**, at 102:9-14.

Russell has no experience with the installation, replacement, or repair of an HVAC compressor. *Id*. at 22:22-23:7. He has no work experience with a compressor designer or manufacturer, an HVAC designer or manufacturer, or a terminal designer or manufacturer. *Id*. at 20:18-21:7. Likewise, Russell has never provided consulting services to a compressor manufacturer or terminal manufacturer for any purpose. *Id*. at 22:8-17. He has never designed a compressor, a component part of a

compressor or an HVAC system. Russell Depo., **Ex. 8**, at 21:11-16.[8] And he has never compared the Emerson compressor to designs from other compressor manufacturers. *Id*. at 205:20-206:3.

Notwithstanding the absence of any testing, a lack of knowledge about the cause of the terminal venting in this case and a dearth of experience with compressor design, Russell speculates that all venting can be prevented through certain alternative designs. The only evidence, however, of Russell's "alternative designs" are two crude drawings he scribbled on notebook paper *during* his deposition in response to questions from Emerson's counsel:

---

[8] Russell claims to have designed "electrical controls" for an HVAC system but concedes that such work has no relevance to the opinions offered in this case. *Id*. at 21:17-22:7.



These "alternative" designs do not appear in Russell's report, much less a description of any methodology of any kind behind these so-called "designs." In fact, they do not exist in any form beyond Russell's rudimentary sketches. Russell has never constructed any prototypes or conducted any testing of these designs. Russell Depo., **Ex. 8**, at 88:21-89:2. There are no specifications for these designs. He cannot identify any compressors from any manufacturer that utilize the kind of connections depicted in his designs. *Id*. at 271:16-23. He can point to no patent utilizing these methods. *Id*. at 240:3-11. In fact, although he asserts that his designs

would solve the problem, Russell cannot identify any compressor on the market from any manufacturer that is incapable of venting:

> Q.    Are you able, Dr. Russell, to identify any compressor in the marketplace that is vent proof, that will not vent?
>
> A.    No. Not done that work. It either exists or it doesn't, but I haven't done it.

Russell Depo., **Ex. 8**, at 206:4-9.

When asked what else he had done other than making a drawing of his concept, Russell conceded that he has done *nothing*:

> A.    I haven't done anything more because I don't think it's necessary to do anything more, except talk about a concept that would be an alternative to that terminal assembly which we know has a known failure mechanism.

*Id*. at 245:3-8.

To satisfy Rule 702, more is required than just talking about it. An expert opinion must be based on "methods and procedures of science" rather than "subjective belief or unsupported speculation." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Russell's opinions are not supported by reliable procedures and scientific methodology. While he states in conclusory fashion that this is "simple electrical engineering," he offers no explanation as to those principles on which he relies or how he has applied those principles to reach his opinions. An "expert's assurances that he has utilized generally accepted scientific methodology are insufficient." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) (citation and alteration omitted). This Court's "gatekeeping function requires more than simply 'taking the expert's word for it.'" *Frazier*, 387 F. 3d at 1261(quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)).

Russell's opinions, regarding the design of the compressor and its terminal, developed solely for this litigation, do not satisfy a single factor used to assess reliability. *Hughes*, 766 F.3d at 1329 (listing the reliability factors). To the extent Russell applied any methodology, it cannot be and has not been tested. There is no evidence that Russell's theory or technique has been subjected to peer review or the known or potential rate of error of the methodology employed. Finally, there is no showing that the methodology is generally accepted. To the contrary, the undisputed evidence is that Russell's theories have not been adopted or accepted anywhere.

Russell's opinions on the compressor's design are speculative and unreliable. Because his testimony does not satisfy the requirements of Rule 702 and would be

unduly prejudicial to Emerson under Rule 403, Russell's design opinions should be excluded.

### C.    Russell's Opinions (Nos. 2, 4, 6 and 11) That Emerson Acted "Negligently," That The Product Is "Defective" And Assigning Fault Are Inadmissible Legal Opinions.

Throughout his report, Russell offers inadmissible legal opinions. In Opinions No. 6 and 11, for example, Russell states that "Emerson was negligent in designing, making, and selling the subject compressor that failed and caused injuries to Mr. Jester." Report, **Ex. 9**, at 4 and 6. He also labels the compressor as "defective." *Id*. at 3 (Opinion No. 4). Finally, Russell opines that Jester was without fault. *Id*. (Opinion No. 2). These opinions are inadmissible.

An expert witness may not give a legal opinion. *Cook v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005). "'[C]ourts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law.'" *Commodores Entm't Corp. v. McClary*, 879 F. 3d 1114, 1129 (11th Cir. 2018) (quoting *U.S. v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977)).

An expert's opinion that a defendant was "negligent" is a textbook example of an inadmissible legal opinion. *See Schober v. Maritz Inc.*, No. 07–CV–11922, 2008 WL 544948, at *3 (E.D. Mich. Feb. 26, 2008) ("Further, [the expert's] opinion

that Defendant was 'negligent' amounts to a legal conclusion, and is therefore particularly problematic."); *Emp'rs Ins. of Wausau v. Latex Contr. Co.*, No. 1:01-CV-1909-BBM, 2003 WL 26087498, at *8 (N.D. Ga. Sept. 2, 2003) (excluding portions of expert's testimony which relate to "negligence"); *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 709 (2nd Cir. 1989) (holding that trial court should have excluded expert's testimony that defendant was negligent). Russell cannot be permitted to testify that Emerson was "negligent."

For the same reasons, Russell cannot testify that the compressor is "defective." *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2187, 2018 WL 4212409, at *3 (S.D. W. Va. Sept. 4, 2018) (precluding expert witness from testifying that product's design was "unreasonably dangerous and defective"). Whether a product is "defective" or not is a question the jury decides based upon the law that comes exclusively from the Court. It is not a proper subject for expert testimony. *See Greger v. C.R. Bard, Inc.*, No. 4:19-CV-675-SDJ, 2021 WL 3855474, at *10 (E.D. Tex. Aug. 30, 2021) (excluding expert testimony that product was "defective"); *Warren v. C.R. Bard, Inc.*, No: 8:19-cv-2657-T-60JSS, 2020 WL 1899838, at *3 (M.D. Fla. Apr. 17, 2020) (granting defendant's motion to exclude expert testimony that product was "defective" and "unreasonably dangerous"); *Sutphin v. Ethicon, Inc.*, No. 2:14-cv-01379, 2020 WL 2517235, at *2

19

(S.D. W. Va. May 15, 2020) (holding that an expert was not permitted to testify that product was "defective"); *Perez v. Townsend Eng'g Co.*, 562 F.Supp. 2d 647, 652 (M.D. Pa. 2008) (expert is precluded from using legal terms of art and cannot give legal conclusion as to whether product was "defective").

Lastly, Russell's opinions absolving Jester from all fault are not proper expert opinions but are instead another instance where Russell, acting as an advocate, instructs the jury on how they should rule. An expert's opinion that "[the plaintiff] did nothing to contribute to her accident is an impermissible legal conclusion . . . and is defective because under *Daubert* an expert 'may not testify as to his opinion regarding ultimate legal conclusions.'" *Ryken v. Celebrity Cruises, Inc.*, No. 18-cv-25152-UU, 2019 WL 5485177, at *6 (S.D. Fla. Sept. 10, 2019) (quoting *Jordan v. Celebrity Cruises, Inc.*, No. 1:17-20773-Civ, 2018 WL 3584702, at *9 (S.D. Fla., July 25, 2018), quoting in turn, *U. S. v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009)). Accordingly, Russell's opinions (Nos. 2 and 3) that Jester did nothing to cause the accident or that the "sole cause" of the accident was the venting of the compressor should be excluded.[9]

---

[9] These opinions also fail to satisfy the "helpfulness" requirement under Rule 702. Given that Russell's opinions are not conclusions reached through the application of any methodology, the jury is as capable as Russell of considering the facts and deciding the cause of the accident.

**D.     Russell's Subjective Opinions ((Nos. 3, 5 and 7) Regarding What Emerson Or Jester "Knew" Are Not Admissible.**

Russell's report contains several subjective, "state of mind" opinions. For example, in Opinion No. 3, Russell states that "Mr. Jester could not and did not know the compressor was near failure and/or venting from internal causes." *See* Report, **Ex. 9**, at 3. In Opinions No. 5 and 7, Russell opines that Emerson has "long known of the dangers" of terminal venting. *Id*. at 4. These "opinions" are not based upon any specialized knowledge or reliable methodology. Instead, Russell is merely speculating about Emerson's state of mind and parroting Jester's deposition testimony, which the jury can consider without assistance from an expert. This testimony is not admissible.

"Expert witnesses are not 'permitted to testify . . . regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred.'" *Astrazeneca LP v. Tap Pharm. Prods., Inc.*, 444 F.Supp. 2d 278, 293 (D. Del. 2006) (quoting *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F.Supp. 2d 431, 443 (D. Del. 2004)). *Accord In Re Xerox Corp. Sec. Litig.*, 746 F.Supp. 2d 402, 415 (D. Conn. 2010) (expert not allowed to testify regarding what a party knew or should have known).

Russell's opinions regarding what Emerson or Jester "knew" or "must have known" are not expert opinions at all. *See In re Rezulin Prods. Liab. Litig.*, 309

F.Supp. 2d 531, 546 (S.D. N.Y. 2004) ("[T]he opinions of [expert] witnesses on the intent, motives, or states of mind of corporations . . . have no basis in any relevant body of knowledge or expertise."). They are simply statements of his subjective beliefs made as an advocate that are not the product of any methodology. Moreover, Russell is not qualified to give such an opinion as he does not possess any specialized expertise on the knowledge of another party.

Russell's testimony on what Emerson or Jester "must have known" also fails the "helpfulness" test. His opinions regarding what Emerson knew or should have known are based solely on the fact that he has been hired to testify against Emerson in two other lawsuits, which involved vastly different facts. Russell Depo., **Ex. 8**, at 229:8-12. Russell goes on to speculate that "there's got to have been a lot of knowledge about this." *Id*. at 229:21-22. Importantly, however, Russell concedes that has no knowledge of Emerson's experience with terminal venting prior to 2006 when the compressor at issue was manufactured:

> Q.    Do you have any knowledge as to Emerson's history with terminal venting or experience with terminal venting prior to 2006?
>
> A.    I've already said no.

*Id*. at 230:22-231:3.[10]

---

[10] Russell glibly replied "I don't care" with respect to his lack of knowledge of Emerson's history of lawsuits involving terminal venting or other instances of

To the extent Emerson's "knowledge" is relevant at all, the jury can hear the evidence and reach its own conclusions without Russell's testimony. Russell's speculative opinions are not helpful to the jury.

Russell's opinions regarding what Jester knew or did not know are derived exclusively from reading Jester's deposition. This testimony does not help the jury understand any matter beyond the understanding of a lay person. *See Liqwd, Inc. v. L'Oréal USA, Inc.*, No. 17-14-JFB-SRF, 2019 WL 8014103 at *5 (D. Del. June 25, 2019) ("[T]he Court will not permit [an expert] to summarize witness testimony just for the sake of summarizing it . . . ."). "An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge." *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424 (S.D. N.Y. 2009) Accordingly, Russell's testimony is not admissible.

### E.     Russell May Not Offer Any Opinions Regarding Warnings.

Finally, in his March 7, 2019, report, Russell includes the conclusory statement that Emerson has "failed to warn" of known dangers with its compressors.

---

terminal venting. Russell Depo., **Ex. 8**, at 229:14-17; 230:7. But he concedes that he has no knowledge when the first terminal venting injury incident was reported to Emerson. *Id*. at 230:11-12.

Report, **Ex. 9**, at 4 (Opinion No. 7). A few weeks later, on April 19, 2019, Russell

stated under oath that he was not offering any opinions regarding warnings:

> Q. And so if there had been some additional warning on the compressor
> regarding terminal venting or any subject, it would not have made a
> difference in Mr. Jester's accident; fair?
>
> A. I'm not going to say that because I didn't investigate it. I have no
> opinions about it. I have no knowledge of him being inside to reading
> anything, but I also have no -- asked no questions about that and never
> talked to him. If someone else has opinions about that, so be it. I have
> no opinions about that.
>
> Q. So sitting here today, are you offering an opinion that any addition
> of a warning by Emerson Climate would have prevented or lessened the
> chances of Mr. Jester's accident?
>
> A. *No, I have no opinion about that at all. I'm not offering any.*

Russell Depo., **Ex. 8**, at 104:14-105:11 (emphasis added).

Given his unequivocal deposition testimony, Russell should be precluded

from offering any opinions at trial regarding the adequacy of Emerson's warnings.

24

## III.

## CONCLUSION

Plaintiff has not carried his burden of establishing qualification, reliability, and helpfulness for Russell's opinions. Instead, those opinions consist of inadmissible legal conclusions or are grounded in Russell's *ipse dixit* without the application of any reliable methodology. Accordingly, Russell's testimony should be excluded.

Respectfully submitted this 30th day of September 2021,

/s/ Christopher C. Yearout
Adam K. Peck (*Pro Hac Vice*)
Melody H. Eagan (*Pro Hac Vice*)
Christopher C. Yearout (*Pro Hac Vice*)
LIGHTFOOT, FRANKLIN & WHITE, LLC
400 20th Street North
Birmingham, AL 35203
Telephone: (205) 581-0700
*apeck@lightfootlaw.com*
*meagan@lightfootlaw.com*
*cyearout@lightfootlaw.com*

-and-

/s/ Anna Green Cross
Darren Summerville
Anna Green Cross
THE SUMMERVILLE FIRM, LLC
1226 Ponce de Leon Ave., NE
Atlanta, Georgia 30361
Telephone: (770) 635-0030
*darren@summervillefirm.com*
*anna@summervillefirm.com*

**Attorneys for Defendants Emerson Climate Technologies, Inc. and Emerson Electric Co**.

26

## **FONT CERTIFICATION**

Pursuant to LR 5:1(c), I hereby certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

LIGHTFOOT, FRANKLIN & WHITE, LLC

/s/ Christopher C. Yearout
Christopher C. Yearout

400 20th Street North
Birmingham, AL 35203

*Attorney for Defendants*
*Emerson Climate Technologies, Inc. and*
*Emerson Electric Co.*

27

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of September 2021, I electronically filed the foregoing via the CM/ECF system, which will send notice of such filing to all counsel of record as follows:

Mark Link, Esq.
LINK & SMITH P.C.
2142 Vista Dale Court
Tucker, GA 30084
link@linksmithpc.com

Maha Y. Amircani, Esq.
AMIRCANI LAW LLC
1201 Peachtree Street, NE
Suite 200
Atlanta, GA 30361
maha@amircani.com

/s/ Christopher C. Yearout
OF COUNSEL

28