## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

VINCENT JESTER,

     Plaintiff,

         v.

EMERSON CLIMATE
TECHNOLOGIES, INC., et al.,

     Defendants.

CIVIL ACTION NO.
1:19-cv-05735-WMR

## <u>ORDER</u>

Before the Court are two motions filed by Defendants Emerson Climate Technologies, Inc. ("Emerson Climate") and Emerson Electric Co. ("Fusite," and collectively "Emerson").  First, Emerson moves to exclude testimony from one of Plaintiff Vincent Jester's witnesses, Dr. B. Don Russell, Jr.  [Doc. 51.]  Second, Emerson moves for summary judgment on Mr. Jester's claims.  [Doc. 53.]  The Court held a hearing on the two motions on December 20, 2021.  [Doc. 72.]  After careful consideration of the parties' arguments, the applicable law, and the relevant parts of the record, and for the reasons discussed herein, the Court excludes Dr. Russell's testimony and grants summary judgment to Emerson.

## I.   Background

Mr. Jester is an unlicensed, self-taught electrician with no training or experience in air conditioning servicing work. [Doc. 53-1 at 3 ¶ 1; Doc. 56 ¶ 1.] In September 2016, the owner of a restaurant in Atlanta called Mr. Jester and asked him to determine whether electricity was reaching an air conditioning unit at the restaurant. [Doc. 53-1 at 3 ¶ 2; Doc. 56 ¶ 2.] When he arrived, Mr. Jester turned both the circuit breaker and the disconnect switch for the air conditioning unit to the "on" position and determined that the unit was receiving power. [Doc. 53-1 at 3 ¶¶ 3–4; Doc. 56 ¶¶ 3–4.]

After turning off the disconnect switch and speaking with a friend who was more familiar with the equipment, Mr. Jester turned the disconnect switch back on and waited to see what would happen. [Doc. 53-1 at 4 ¶¶ 6–7; Doc. 56 ¶¶ 6–7.] A few seconds later, the contents of the air conditioning unit's compressor ignited as it was "terminally vented"—*i.e.*, expelled through the terminal. [Doc. 53-1 at 4 ¶ 9; Doc. 56 ¶ 9; *see* Doc. 51-1 at 5 n.2; Doc. 54 at 3.] Mr. Jester suffered burns to his hands and left forearm. [Doc. 53-1 at 4 ¶ 9; Doc. 56 ¶ 9.]

In November 2019, Mr. Jester commenced this action against Emerson in Georgia state court. [Doc. 1-1 at 8.] He brought claims for strict liability and negligence based on Emerson's design of the compressor and the terminal. [*Id.* at 13–27; *see also* Doc. 5 at 7–22.] There is no dispute that Emerson Climate designed

the air conditioning unit's compressor and that Fusite designed the unit's 700-series electrical terminal.  [Doc. 53-1 at 6–7 ¶¶ 19–21; Doc. 56 ¶¶ 19–21.]  Emerson removed the action to this Court based on the Court's diversity jurisdiction.  [Doc. 1 at 1.]  After some procedural matters not relevant to this order, Emerson filed the two motions at issue here.

First, Emerson moves to exclude testimony from one of Mr. Jester's witnesses, Dr. Russell, under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  [Docs. 51, 51-1.]  Emerson argues that the Court should exclude Dr. Russell's testimony because, among other reasons, Dr. Russell's methodology regarding alternative designs is unreliable.  [*See* Doc. 51-1 at 1–3.]  Second, Emerson moves for summary judgment on Mr. Jester's claims.  [Doc. 53.]  Emerson asserts that, without Dr. Russell's testimony, Mr. Jester cannot show that the compressor and the terminal were defective or that there were feasible, safer alternative designs.  [Doc. 53-1 at 2.]  Emerson also argues that Mr. Jester cannot satisfy the proximate cause requirement because the accident occurred due to unforeseeable product misuse and alteration.  [*Id.*]  Mr. Jester opposes both motions.  [Docs. 54, 55.]  The Court held a hearing on the motions on December 20, 2021.  [Doc. 72.]

## II.     Discussion

The Court starts with Emerson's motion to exclude and then turns to its motion for summary judgment.

### A.     Emerson's Motion to Exclude Dr. Russell's Testimony

This Court has a "gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328–29 (11th Cir. 2014).  The Eleventh Circuit has "distilled the expert admissibility inquiry" under Federal Rule of Evidence 702 and *Daubert* into three prongs: (1) whether "the expert is qualified to testify competently regarding the matters he intends to address," (2) whether "the methodology by which the expert reaches his conclusions is sufficiently reliable," and (3) whether "the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850–51 (11th Cir. 2021).  The Eleventh Circuit has repeatedly characterized this as a "rigorous three-part inquiry." *See, e.g.*, *In re Teltronics, Inc.*, 904 F.3d 1303, 1311 n.4 (11th Cir. 2018).   The burden of establishing the three prongs of qualification, reliability, and helpfulness rests on the proponent of the expert opinion, which in this case is Mr. Jester. *See Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1245 (11th Cir. 2018).

The three prongs are "distinct concepts," so "the reliability criterion remains a discrete, independent, and important requirement for admissibility that may not be subsumed by the qualification prong." *Moore*, 995 F.3d at 851–52 (quotation marks and emphasis omitted) (quoting *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004)).  When assessing the reliability prong, the Court "look[s] to a number of factors, including (1) whether the methodology can be and has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or potential rate of error of the methodology employed, and (4) whether the methodology is generally accepted." *Hughes*, 766 F.3d at 1329.  These factors are not meant to be exhaustive. *Id.*

"The law of this Circuit is clear that the district courts are given broad discretion with wide latitude in conducting a *Daubert* analysis." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1343 (11th Cir. 2010).  Part of the reason for this "considerable flexibility" is that the "rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization." *Teltronics*, 904 F.3d at 1311.

Emerson primarily argues that Dr. Russell's testimony should be excluded because his methodology in this case is not reliable.[1]  [Doc. 51-1 at 11–18.]  More

---

[1] Emerson also argues that Dr. Russell's testimony should be excluded because it impermissibly provides legal conclusions, including that the compressor was "defective," and opinions regarding Emerson's and Mr. Jester's states of mind.  [Doc. 51-1 at 18–23.]  Mr. Jester does not contest these points, so he has abandoned any arguments in support of them.  [*See*

specifically, Emerson asks the Court to exclude Dr. Russell's testimony—in which he "seeks to opine that the compressor was improperly designed"—because the testimony is based on his *ipse dixit* and not a reliable methodology. [*Id.* at 11–12.] Although Emerson acknowledges that Dr. Russell testified about alternative designs, Emerson contends that the only evidence of alternative designs are "two crude drawings [Dr. Russell] scribbled on notebook paper during his deposition." [*Id.* at 14–15 (emphasis omitted).] In Emerson's view, Dr. Russell's sketches are insufficient under Rule 702 and *Daubert* because he has not provided a "description of any methodology of any kind behind these so-called 'designs,'" he has not conducted testing on these designs, and he could not identify a single compressor from any manufacturer that uses the designs. [*Id.* at 15–16.] Therefore, Emerson argues that the testimony does not satisfy any of the reliability factors and thus must be excluded. [*Id.* at 17–18.]

In response, Mr. Jester outlines Dr. Russell's qualifications and expertise, including his multiple degrees in electrical engineering and the fact that his opinions have been admitted in another case involving Emerson. [Doc. 54 at 4–6, 8–9.] He

---

*generally* Doc. 54; *see also* Doc. 67 at 3.] In any event, the Court agrees with Emerson that these opinions should be excluded. *See, e.g.*, *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1128–29 (11th Cir. 2018) (holding that the expert's "legal conclusions were properly struck" because an expert "may not testify to the legal implications of conduct"); *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006) (concluding that there was "no error in the court's decision to strike the portions of [the expert's] testimony which contain legal conclusions as to another person's state of mind" because she "was not qualified as an expert on the state of mind of others").

asserts that Dr. Russell "utilized accepted princip[les] of electrical engineering and the application of his extensive education, training, professional experience and personal knowledge to analyze the subject product and form his opinions." [*Id.* at 9.] Mr. Jester also claims that Dr. Russell "testified in depth" about other alternative designs besides those "drawn on a sheet of paper." [*Id.* at 10–11.] To the extent Emerson "take[s] issue with the feasibility of the alternative designs," Mr. Jester argues that the feasibility should be decided by a jury and should not be a basis for his excluding his testimony. [*Id.* at 14–17.]

In his expert report, Dr. Russell repeatedly opined that Emerson failed to incorporate alternative designs, which he believed would have prevented the terminal venting and thus prevented Mr. Jester's injuries. [*See* Doc. 52 ¶¶ 8–10, 12.] At his deposition, Emerson's counsel asked Dr. Russell whether there were any "alternative designs that [he would] be offering at the trial of this case" besides those drawn on notebook paper. [Doc. 53-12 at 306.] Dr. Russell responded, "I have no other offerings."[2] [*Id.*] When Emerson's counsel pressed Dr. Russell on whether he

---

[2] Dr. Russell also said he would "potentially" offer a 700-series terminal as an alternative design. [Doc. 53-12 at 306.] He testified that if the "terminal is a fuse itself, then the idea is that the terminal would literally burn into and break off before it heated up sufficiently" to allow for terminal venting. [*Id.* at 254–55.] He said that a 700-series terminal is "an example of that concept." [*Id.* at 257.] In opposing Emerson's motion to exclude, Mr. Jester points to this proffered alternative design. [*See* Doc. 54 at 10 (citing Doc. 53-12 at 254–55).] However, a 700-series terminal is not an *alternative* design because it is undisputed that the terminal in this case was in fact a 700-series terminal. [Doc. 53-1 at 7 ¶ 21; Doc. 56 ¶ 21; *see* Doc. 51-5 ¶ 5.] Accordingly, Dr. Russell's testimony regarding a 700-series terminal is not helpful to the trier of fact. *See Moore*, 995 F.3d at 851. Beyond that, even assuming the testimony regarding a 700-

would offer anything other than the drawings, Dr. Russell confirmed "[t]hat's all [he] would offer today." [*Id.* at 307.] As such, the Court addresses the alternative designs drawn during the deposition.

The first design reflects a wiring harness used for a compressor. [*See id.* at 241–44; *see also* Doc. 54 at 10 (citing Doc. 53-12 at 241, 243).] Although Dr. Russell was able to explain the concept of the wiring harness, he refused to explain what steps he had taken to develop the design, to validate the design, or to "show



this is a feasible, workable design." [Doc. 53-12 at 240–42.] Instead, he simply stated that the development "can be done by having the appropriate level of engineering," that the design involved "plain old ordinary engineering," and that "(A) it's feasible because it's basic electrical engineering; (B) it is possible." [*Id.*] Dr. Russell

---

series terminal is admissible, the testimony does not foreclose summary judgment, and thus is immaterial, because the terminal in this case was a 700-series terminal.

could not point to any compressors in the market that use this wiring harness or patents relating to compressors that use this wiring harness. [*Id.* at 239–40.] When asked what work he had done in this case on this design, other than coming up with the concept and saying he can do it, Dr. Russell offered only to draw the design, which the parties marked as Exhibit 12. [*Id.* at 242–44.] Emerson's counsel then asked, "[o]ther than making that drawing and coming up with this concept, have you done anything more?" [*Id.* at 244–45.] Dr. Russell responded, "I haven't done anything more because I don't think it's necessary to do anything more, except talk about a concept that would be an alternative." [*Id.* at 245.]

The second design reflects a guard around the plug which would supposedly prevent the compressor from venting its contents into the air. [*Id.* at 275; *see* Doc. 54 at 10–11 (citing Doc. 53-12 at 275).] Dr. Russell also drew this design during his deposition, which the parties marked as Exhibit 13. [Doc. 53-12 at



271.]  He did not identify any compressors that use this design because he "got it from basic engineering," and the extent of his design work "consisted of this drawing."  [*Id.* at 271, 278–79.]  He did not do any prototyping of this design with a compressor.  [*Id.* at 283.]  According to Dr. Russell, he did not have to design anything because it is "just plain old ordinary standard electrical engineering stuff."[3] [*Id.* at 279.]

The Court determines that Dr. Russell's testimony on these alternative designs must be excluded because Mr. Jester fails to show that Dr. Russell's methodology is reliable.  As an initial matter, Mr. Jester does not even argue that any relevant reliability factors are met in this case.  [*See generally* Doc. 54.]  The factors nonetheless demonstrate that Dr. Russell's methodology is not reliable.  *See Hughes*, 766 F.3d at 1329.  In his expert report and deposition, Dr. Russell did not explain the steps he took to develop the designs or to validate the designs, so it does not appear his methodology has been tested.  Indeed, he testified that he did not do anything besides talking about and drawing the designs.  Along the same lines, there is no indication that the development of the designs and the designs themselves have been subjected to peer review or that there is a known error rate.  Finally, because

---

[3] Mr. Jester cites a patent that he says is an example of this design [Doc. 54 at 11], but Dr. Russell unequivocally disclaimed reliance on any patents to support the alternative designs and the feasibility of those designs [Doc. 53-12 at 311].

Dr. Russell could not point to any compressors that use the designs, it does not appear his methodology is generally accepted.

At most, Dr. Russell's methodology is based on "just plain old ordinary standard electrical engineering stuff." [*E.g.*, Doc. 53-12 at 279.] However, "[s]omething doesn't become scientific knowledge just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were derived by the scientific method be deemed conclusive." *Hughes*, 766 F.3d at 1331. In other words, this Court's "gatekeeping function requires more than simply taking the expert's word for it," as neither *Daubert* nor Rule 702 "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*; *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) ("The expert's assurances that he has utilized generally accepted scientific methodology [are] insufficient."). In his expert report and deposition, Dr. Russell did not explain the engineering principles on which he relied, let alone how he applied those principles to reach his opinions. Likewise, while Mr. Jester asserts that Dr. Russell's "opinions are based upon both long understood princip[les] of engineering and physics," he does not explain what those principles are or how Dr. Russell applied them. [*See* Doc. 54 at 9.] The Court therefore finds that Dr. Russell's repeated statements that his methodology is "plain old ordinary"

engineering [Doc. 53-12 at 241, 279] are insufficient to show that his methodology is reliable.

The Court is unpersuaded otherwise by Mr. Jester's arguments.  First, Mr. Jester highlights Dr. Russell's qualifications and his "50 years of experience in the field and academia."  [Doc. 54 at 4–5, 8–9.]  However, the qualification prong is "distinct" from the reliability prong.  *Moore*, 995 F.3d at 851.  Mr. Jester thus cannot rely on Dr. Russell's qualifications to show that his methodology is reliable, as "the reliability criterion . . . may not be subsumed by the qualification prong."  *Id.* (quotation marks and emphasis omitted).  Beyond that, experience alone is insufficient to show that an expert's methodology is reliable; instead, "the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Frazier*, 387 F.3d at 1261.  Dr. Russell failed to do this.

Next, Mr. Jester argues that Dr. Russell testified on another alternative design, besides the drawings, called an "arc fault detection"—a "small package in the wiring harness to detect a short circuit or overload and disconnect power if such a fault occurred, thus preventing a terminal venting event."[4]  [Doc. 54 at 11.]  However, at his deposition, Dr. Russell testified that he would offer only the designs drawn on

---

[4] In passing, Mr. Jester also notes that, in a different case, Dr. Russell "built a protype for an alternative design which is a guard cover to deflect the materials that are expelled during a terminal venting incident."  [Doc. 54 at 5 (citation omitted).]  However, Dr. Russell expressly disclaimed reliance on that alternative design in this case.  [Doc. 53-12 at 87–88, 305.]

notebook paper and "potentially" a 700-series terminal as alternative designs [Doc. 53-12 at 306–07], so it is not apparent Mr. Jester can rely on this other alternative design here. Either way, Dr. Russell's opinion on this alternative design must be excluded for the same reason as his opinion on the drawings, as Mr. Jester fails to show Dr. Russell's methodology is reliable. At his deposition, Dr. Russell could not identify any compressors that use the arc fault detection design and even characterized the design as "exotic." [*Id.* at 320, 338.] Although he testified that the design is "[n]ot hard to do," he failed to provide any explanation of his methodology. [*Id.* at 339.] Therefore, it does not appear that Dr. Russell's methodology has been tested or peer reviewed, has a known error rate, or is generally accepted. *See Hughes*, 766 F.3d at 1329.

Finally, Mr. Jester appears to argue that Dr. Russell's testimony should be admitted because his testimony was admitted in another case, *Emerson Electric Co. v. Johnson*, 601 S.W.3d 813 (Tex. Ct. App. 2018). [Doc. 54 at 6, 8.] The Court finds that this is insufficient to show that Dr. Russell's methodology is reliable in this case. Just because a court admits expert testimony in one case does not establish that the expert's testimony is admissible in all other cases. Indeed, the Court in *Johnson* said nothing about the methodology Dr. Russell used to come up with the proffered alternative designs in this case. *See Johnson*, 601 S.W.3d at 837–38.

For these reasons, the Court excludes Dr. Russell's testimony.

B.    Emerson's Motion for Summary Judgment

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Under Georgia tort law, a product manufacturer may be liable when the product "was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained." O.C.G.A. § 51-1-11(b)(1).  The existence of some defect is an "essential element" of a product liability claim, "whether brought under a theory of strict liability or of negligence." *Udoinyion v. Michelin N. Am., Inc.*, 721 S.E.2d 190, 193 (Ga. Ct. App. 2011).  A plaintiff may show that a product was not merchantable due to one of three product defects: a manufacturing defect, a design defect, or a marketing/packaging defect. *Sheffield v. Conair Corp.*, 821 S.E.2d 93, 96 (Ga. Ct. App. 2018).  Here, the parties agree that this case involves only a purported design defect.  [*See* Doc. 53-1 at 10–11 & n.7; Doc. 55 at 12–13; Doc. 68 at 3 n.1.]

In a design defect case, Georgia law requires a risk-utility analysis that "balance[s] the risks inherent in a product design against the utility of the product so

designed." *Woods v. A.R.E. Accessories, LLC*, 815 S.E.2d 205, 209 (Ga. Ct. App. 2018). "[T]here is no significant distinction between strict liability and negligence for purposes of the risk-utility analysis," such that the Court can "consider the claims of strict liability and negligence together." *Sheffield*, 821 S.E.2d at 96.

There are several "non-exhaustive" factors to be considered under the risk-utility analysis, including the usefulness of the product, the gravity and severity of the danger posed by the design, the likelihood of the danger, the avoidability of the danger, the state of the art at the time the product is manufactured, the manufacturer's ability to eliminate the danger, and the feasibility of spreading the loss in the price or through insurance. *Id.* "One factor consistently recognized as integral to the assessment of the utility of a design is the availability of alternative designs, in that the existence and feasibility of a safer and equally efficacious design diminishes the justification for using a challenged design." *Banks v. ICI Ams., Inc.*, 450 S.E.2d 671, 674 (Ga. 1994). As such, "[l]iability for defective design attaches *only* when the plaintiff proves that the seller failed to adopt a reasonable, safer design that would have reduced the foreseeable risks of harm presented by the product." *Woods*, 815 S.E.2d at 209 (quoting *Banks*, 450 S.E.2d at 674 n.4).

Here, Emerson argues that it is entitled to summary judgment on Mr. Jester's strict liability and negligence claims. First, absent Dr. Russell's testimony, Emerson asserts that Mr. Jester lacks evidence to show that the design of the compressor and

the terminal was defective.  [Doc. 53-1 at 12–13.]  Second, Emerson contends that "the only evidence in this case that even touches on an alternative design" comes from Dr. Russell's inadmissible testimony.  [*Id.* at 14–15, 17.]  Without "the existence of a feasible, safer alternative design," Emerson asserts that Mr. Jester cannot "sustain a claim for design defect."  [*Id.* at 14.]  Finally, Emerson argues that Mr. Jester cannot establish proximate cause because the air conditioning unit at issue was being misused and "underwent substantial modification through the use of an impermissible and illegal flammable refrigerant."  [*Id.* at 17–19.]  Had the correct refrigerants been used, Mr. Jester "would not have been injured because those refrigerants will not ignite under conditions such as those that were present at the unit Jester was inspecting."  [*Id.* at 20.]

The Court determines that Emerson is entitled to summary judgment on Mr. Jester's claims for two reasons.[5]  First, because the Court excludes Dr. Russell's testimony, Mr. Jester lacks evidence to show that the design of the compressor and the terminal was defective.  Mr. Jester cannot simply point to the fact that he was injured because "under Georgia law a manufacturer is not an insurer that its product is, from a design viewpoint, incapable of producing injury."  *Banks*, 450 S.E.2d at 675.  As noted, an "essential element" of a product liability claim, "whether brought

---

[5] Because the Court grants summary judgment on these grounds, the Court need not consider whether Mr. Jester can establish proximate cause.

under a theory of strict liability or of negligence," is the existence of a defect. *Udoinyion*, 721 S.E.2d at 193. Therefore, without evidence of a defect, Mr. Jester cannot succeed on his claims.

Second, because the Court excludes Dr. Russell's testimony, Mr. Jester lacks evidence of a feasible, safer alternative design. The "availability of alternative designs" is "integral" to the risk-utility analysis. *Banks*, 450 S.E.2d at 674. Indeed, one decision by the Court of Appeals of Georgia recognized that "[l]iability for defective design attaches *only* when the plaintiff proves that the seller failed to adopt a reasonable, safer design that would have reduced the foreseeable risks of harm presented by the product." *Woods*, 815 S.E.2d at 209 (quoting *Banks*, 450 S.E.2d at 674 n.4). As such, without evidence of a feasible, safer alternative design, Mr. Jester cannot succeed on his claims.

Mr. Jester argues that summary judgment is improper on this ground because "feasibility of an alternative design is just one aspect of the risk-utility analyses and is not in itself the determining factor." [Doc. 55 at 7.] To be sure, another decision by the Court of Appeals of Georgia stated that the existence of an alternative design is not "controlling," as "no one factor alone is a prerequisite for bringing a claim." *Bodymasters Sports Indus., Inc. v. Wimberley*, 501 S.E.2d 556, 560 (Ga. Ct. App. 1998). However, the Court need not decide whether the lack of an alternative design is dispositive here. Either way, summary judgment is still proper on this ground

because Mr. Jester does not contend that any of the other factors in the risk-utility analysis show that the design was defective.  [*See* Doc. 55 at 7–8.]  Beyond that, Mr. Jester does not point to any evidence in the record concerning these factors to even suggest that the design was defective.

## III.   Conclusion

Accordingly, Emerson's motion to exclude the testimony of Dr. Russell [Doc. 51] and Emerson's motion for summary judgment [Doc. 53] are **GRANTED**.  Mr. Jester's claims are therefore **DISMISSED**, and the Clerk is **DIRECTED** to terminate this case.

**IT IS SO ORDERED**, this 5th day of January, 2022.

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE